POPE METALS COMPANY, Respondent, vs. SADEK and another,
Appellants.

*April 5—April 23, 1912.*

*Sales: Brokers: Bought and sold notes: Statute of frauds: Authority
of brokers: Adding specifications: Custom: Ratification: Breach
of contract: Damages: Duty to minimize: Place of delivery:
World market.*

1. Bought and sold notes, signed by brokers who are agents for
   both buyer and seller and containing the terms of sale, satisfy
   the statute of frauds and constitute a binding contract.
2. Brokers acting for both parties to a sale of copper were author-
   ized to insert in the contract specifications as to the particular
   brand and shape, where the insertion of such provisions by
   the broker was usual and customary in the trade.
3. Where, in such a case, the seller, upon receiving from the
   brokers a telegram stating the terms of the sale, wired to a
   third person to deliver the copper, and also wired to the
   brokers that he had done so, he thereby ratified the sale upon
   the terms stated.

4. As a general rule, in actions for breach of executory contracts of sale the damages are the difference between the contract price and the market price at the time and place fixed by the contract for delivery, with interest from the time of the breach.
5. Upon breach of a contract for sale of copper to be delivered at a recognized world market, the principle that the buyer is bound to exercise reasonable diligence to minimize the damages did not necessarily and as matter of law require him to accept delivery, with an equalization of freight, at another place at which there was no recognized market.

APPEAL from a judgment of the circuit court for Milwaukee county: ORREN T. WILLIAMS, Circuit Judge. *Affirmed.*

This is an action to recover damages for breach of a contract of sale of 100 tons of copper. The plaintiff is a corporation doing business in New York City. The defendants are partners doing business in Milwaukee, and both parties deal in metals. C. S. Trench & Co. are brokers in metals in the city of New York.

On March 17, 1909, the defendants inquired by telegraph of Trench & Co. whether they could sell for them ten cars of copper, late delivery March and April, to which inquiry Trench & Co. replied with a qualified affirmative. On the following day the defendants telegraphed Trench & Co. as follows:

"Sold April copper. Can offer 100 tons March twelve forty one-half Houghton, no commission, acceptance noon tomorrow."

On the same day, on receipt of this telegram, Trench & Co. sold to the plaintiff 100 tons of copper at the price named, and on the following day issued duplicate notes of sale in the following form:

"Buyers Copy (Sellers in duplicate)
                                    "March 19, 1909.
"J. Sadek & Son, Milwaukee, Wis., agree to sell and *Pope Metals Co.,* New York, N. Y., agree to buy one hundred (100) tons, of two thousand pounds each, Prime Lake Cop-

per, non-arsenical brand, for delivery at sellers option during the month of March, 1909, and at buyers option to take delivery, free on board cars or on dock for water transportation via the Lakes at Houghton, Mich., at the price of twelve and forty and one-half hundredths (12.40½) cents per pound. Copper to be delivered in the shape of cakes and / or wire bars and / or ingots and / or ingot bars, according to buyer's specification.

"Terms: Cash on delivery of documents giving them title to the Copper.

"CP          C. S. TRENCH & Co.,
                    "C. J. Trench.

"Accepted ............... . ......
. ... ..................... .
          "(Sellers Signature)
          "(Buyers in duplicate)" .

On the 18th of March, immediately after the sale, Trench & Co. telegraphed the defendants as follows:

"Sold hundred tons March Prime Lake, buyers specifications as to shapes, twelve forty and one-half Houghton, Mich., advise parties from whom you are receiving to deliver to *Pope Metals Company* and wire us by whom such delivery will be made. Answer quick."

One of the broker's sale notes was sent to the plaintiff and one to defendants. Plaintiff signed its note, returned it to Trench & Co., who sent it to the defendants. The note sent to the defendants was retained by them until the trial. It appears that the defendants did not actually have the copper at Houghton, but had a contract with the New York Metal Selling Company to deliver 100 tons of copper at Milwaukee, and they assumed that their vendor would by their direction make delivery at Houghton. They therefore, on receipt of Trench & Co.'s telegram of March 18th, wired the Metal Selling Company to deliver the 100 tons of copper to the plaintiff at Houghton, and also wired Trench & Co. as follows:

"Wired New York Metal Selling, delivery one hundred ton March copper."

On March 19th Trench & Co. wrote the defendants as follows:

"Enclosed we beg to hand you contract covering the 100 tons of Lake Copper sold for your account yesterday. Will you kindly write your acceptance on same and return to us, and we will forward you buyer's acceptance very soon.

"We note that the copper will be delivered by the New York Metal Selling Co., and trust you are making arrangements with these people to have the delivery made to the *Pope Metals Co.,* in accordance with the sale.

"Thanking you for past favors, and awaiting your further orders, we beg to remain," etc.

The New York Metal Selling Company declined to make delivery of the 100 tons of copper to the plaintiff at Houghton, and in fact made actual delivery of the same to the defendants at Milwaukee, according to their contract. The defendants, being unable to make delivery at Houghton, offered to deliver the same at Milwaukee and equalize the freight between Milwaukee and Buffalo. The freight from Milwaukee to Buffalo was four cents per hundred pounds greater than from Houghton to Buffalo. It had been stated by the plaintiff in one of its letters that it desired the copper in barrels at Houghton "for forwarding by steamer to New York via Buffalo." The plaintiff declined to accept the defendants' offer, and insisted on delivery at Houghton according to the contract. Such delivery being finally refused by the defendants on April 6th, the plaintiff, after notice to the defendants, purchased 100 tons of copper at Houghton at the lowest market price, viz. $12.75, which amounted to $690 more than the contract price.

The trial court held that the contract was a valid contract, and that the only question was as to the amount of damages. This question being submitted to the jury, a verdict for $690 damages was returned and judgment was rendered for the plaintiff thereon, from which the defendants appeal.

*B. F. Saltzstein,* for the appellants.

For the respondent there was a brief by *Bloodgood, Kemper & Bloodgood,* attorneys, and *Jackson B. Kemper,* of counsel, and oral argument by *Jackson B. Kemper.*

WINSLOW, C. J. The trial court was right in holding that there was a binding contract shown as matter of law. The brokers were the agents of both parties, and the bought and sold notes signed by them and containing the terms of the contract satisfied the statute of frauds. *Bibb v. Allen,* 149 U. S. 481, 13 Sup. Ct. 950; *Newberry v. Wall,* 84 N. Y. 576; 20 Cyc. 256.

It is said, however, that the brokers were not authorized to insert in the contract specifications as to the particular brand or shape of the copper. All the evidence bearing on the subject tends to show that the insertion of such provisions by the broker is usual and customary in the trade, but were this otherwise it is very clear that the contract was expressly ratified and approved by the defendants' telegram of March 18th to Trench & Co., and by their telegram of the same date to the New York Metal Selling Company, instructing them to make delivery of the 100 tons of copper to the plaintiffs in accordance with the broker's contract.

The only question in the case, therefore, was the question of the amount of the damages. It cannot be denied that as a general rule, in actions for breach of executory contracts of sale, the damages are the difference between the contract price and the market price at the time and place fixed by the contract for delivery, with interest from the time of the breach. *Vogt v. Schienebeck,* 122 Wis. 491, 100 N. W. 820; *Southern F. & G. Co. v. McGeehan,* 144 Wis. 130, 128 N. W. 879.

The appellants invoke the well established principle that it is the duty of the plaintiff, in case of a breach of contract, to exercise reasonable diligence to minimize the damages, and argue that, as it appears that it gave directions to the effect that the copper was to be delivered at the docks in Houghton

ready to be forwarded by steamer to Buffalo, it was plaintiff's duty to accept it at the docks in Milwaukee ready for forwarding by steamer to Buffalo, provided that the defendants equalized the difference in freight, amounting to $80, which they offered to do.

The court is of the opinion that it cannot be said as matter of law that the plaintiff was bound to accept delivery at Milwaukee with an equalization of freight. This was not an isolated purchase of certain articles of merchandise to be delivered at Buffalo, and which might just as well be shipped from Milwaukee as from Houghton; but it was, on the other hand, a transaction in the market of the world, where it is well known that certificates and bills of lading are generally used to discharge contracts, and that the right to call for delivery of a staple commodity at a recognized world market is generally of much greater value than the right to call for delivery at a place where there is no recognized market.

The jury in the present case found, under instructions which are not complained of, that the plaintiff's damage was $690, and we cannot say that the finding is erroneous.

*By the Court.*—Judgment affirmed.